In the Matter of: GUARANTEED MUF-
FLER SUPPLY COMPANY, INC., for-
merly, Guaranteed Muffler Supply Com-
pany, Bankrupt.

Roger W. MOISTER, Trustee, Plaintiff,

v.

The NATIONAL BANK OF GEORGIA,
and Mary Hamilton, Defendants.

No. B79–819A.

United States Bankruptcy Court,
N. D. Georgia,
Atlanta Division.

Nov. 27, 1979.

Roger W. Moister, Atlanta, Ga., for plaintiff.

Donald J. Goodman, Jack A. Wotton, Atlanta, Ga., for defendants.

## ORDER AND MEMORANDUM OF OPINION

A. D. KAHN, Bankruptcy Judge.

Having sold property of the bankrupt corporation free and clear of liens and having obtained a court order which transferred liens on the property to the cash received as a result of the sale, the Trustee now asks this Court to determine the validi-

ty, extent, and priority of claims now being made to that cash.

## FINDINGS OF FACT

On March 2, 1976, the partners of Guaranteed Muffler Supply Company, Mary Hamilton and W. A. Hamilton, executed a note and security agreement· in favor of The National Bank of Georgia (NBG) as consideration for a $50,000 loan. The partnership's inventory and accounts, which acted as collateral for the loan, were financed by cash advances made under the loan. NBG's security interest in the collateral was perfected by the filing of a financing statement at the Fulton County, Georgia, Courthouse three days after the agreement was signed. NBG's interest in the proceeds was perfected several months later, on July 26, 1976.

About a year later, in June of 1977, the partnership sold its assets to a newly formed corporation, which was called GUARANTEED MUFFLER SUPPLY CO., INC. The members of the former partnership, in satisfaction of their interests, received shares of stock in the new corporation.

NBG did not file a new financing statement listing the corporation as a debtor, and, more importantly, NBG failed to obtain a new security agreement with the new corporation.

The extent of the bank's knowledge of the creation of the new corporate entity is unclear. It is undisputed, however, that a corporate resolution and a corporate income statement were in the bank's files when the corporation declared bankruptcy in March of 1979.

After the corporation was formed, but before it filed for bankruptcy, one of the former partners, Ms. Hamilton, personally loaned the corporation $7,000 in exchange for demand notes secured by liens on the inventory and accounts of the corporation.

At the time of the corporation's bankruptcy, about $4,000 of Ms. Hamilton's claim was unsatisfied, and NBG was still owed about $20,000 on its loan to the old partnership.

## CONCLUSIONS OF LAW

Since Ms. Hamilton is personally liable to the extent that NBG's claim is unsatisfied, the validity and priority of NBG's claim on the corporate property, (now in the form of cash held by the Trustee), will be considered first.

■ Initially, it should be noted that NBG obtained a signed security agreement from the members of the partnership, as *Ga.Code Ann.* § 109A–9–203(1) (1962)[1] requires for the creation of a security interest. Significantly, however, NBG failed to obtain a signed agreement with representatives of the corporation. In addition, there is no language in the partnership security agreement that indicates an intent that the successors of the partnership were to assume the lien-creating obligations of the agreement. *Compare Fliegel v. Associates Capital Co. of Del., Inc.*, 17 UCC Rep.Serv. 850 (Or.Sup.Ct.1975).

As a result, NBG has a valid lien only on: (1) the partnership's inventory which survived until the Trustee held his sale; (2) the partnership accounts which remained uncollected until the Trustee's sale; (3) whatever proceeds were received by the partnership upon the sale of the collateral (inventory and accounts), and, as explained below; (4) whatever proceeds were received by the corporation upon its sale of the partnership's inventory and accounts. *Ga.Code Ann.* § 109A–9–306(2) (1962). NBG has no claim to property of the bankrupt corporation, (now in the form of cash held by the Trustee), unless it falls into one of those categories.

*Rights of NBG to the Unconverted Collateral*

■■ Any time a debtor sells collateral and the sale is not "authorized by the se-

---

1. Since the security agreement entered into with the partnership is dated March 2, 1976, and the 1972 amendments to the UCC did not take effect in Georgia until July 1, 1978, the 1962 version of the UCC governs the instant case.

cured party," the lien continues in the property in the hands of the third-party purchaser. In this case, there is no evidence of such an authorization by NBG. In fact, at the time of the sale of the partnership assets, which included the collateral, to the corporation, the bank had no knowledge of the sale, and even if the bank did indeed possess such knowledge, that knowledge would not constitute adequate grounds for a conclusion that the sale was "authorized." *In re Kittyhawk Television Corp.*, 383 F.Supp. 691, 694 (S.D.Ohio 1974). Accordingly, it can be said that NBG has a valid security interest in the partnership's inventory and accounts which were not sold or converted from the time of their sale to the corporation until the public auction held by the Trustee after bankruptcy.

This result obtains with respect to this unconverted collateral even though NBG's interest is challenged by a Trustee in bankruptcy, whose status is the same as that of a lien creditor under § 70c of the Bankruptcy Act. With such a status, only a lack of perfection of NBG's interest would defeat the interest. *Ga.Code Ann.* § 109A–9–301(1)(b) (1962).

The Trustee's argument that NBG's failure to add "Inc." to the name of the debtor on its financing statement causes NBG's interest to become unperfected this Court finds unpersuasive. The collateral was sold to a third party, *i. e.*, the corporation, and NBG's interest in the collateral itself continues regardless of the fact that this separate purchasing entity had a name similar to the seller/debtor/partnership. The only situation in which a failure to change the name on a financing statement is of any relevance is when a secured party has a floating lien on property owned by a continuously existing debtor who changes his or her name during the valid lifetime of the lien.[2] In the instant case, the debtor sold the collateral and then ceased to exist. Whether the name of the purchasing entity, *i. e.*, the corporation, ap-

pears on a financing statement is irrelevant to the question of the perfection of the secured party's interest in the collateral which was once in the hands of a debtor who no longer exists. *Ryan v. Holland*, 434 F.2d 353 (10th Cir. 1970).

It should also be noted that, while ordinary course of business purchasers from the corporation took the collateral free of a security interest, *Ga.Code Ann.* § 109A–9–307 (1962), the bankrupt corporation, as a bulk transferee of the collateral, has no such defense. *Ga.Code Ann.* §§ 109A–9–307(1), 109A–1–201(9) (1962).

### Rights of NBG to Proceeds from the Sale of the Collateral

There are two sets of proceeds from the sale of the partnership's inventory and accounts. The first set consists of whatever was received by the debtor/partnership upon sale of the collateral, and the second set consists of whatever was received by the corporation when it sold the collateral in the ordinary course of its business.

The members of the debtor/partnership received shares of stock in the new corporation as proceeds from the sale of the partnership's assets, part of which was subject to NBG's lien. This first set of proceeds in the form of corporate shares is virtually worthless, since the corporation is presently liquidating under the auspices of this Court; nonetheless, to whatever extent those shares represent value and to whatever extent they represent that portion of the partnership's assets which are attributable to the inventory and accounts, NBG has a valid claim to the shares.

This result with respect to the first set of proceeds is required by the statutory definition of "proceeds," *Ga.Code Ann.* § 109A–9–306(1) (1962), and by the unqualified right of a secured party to such proceeds in the

---

**2.** *See, e. g., In re Kittyhawk Television Corp.*, 516 F.2d 24, 28 (6th Cir. 1975); *Matter of Reeco Elec. Co., Inc.*, 415 F.Supp. 238 (D.Me. 1976); *In re Vieth's, Inc.*, 9 UCC Rep.Serv. 943 (Bk.Ct.E.D.Wis.1971).

hands of the debtor, *Ga.Code Ann.* § 109A–9–306(2) (1962).[3]

■ The second set of proceeds, which is whatever was received by the bankrupt corporation when it sold the partnership's inventory and accounts, will be referred to herein as the "transferee's proceeds." These proceeds are the fruits of a second sale of the collateral. NBG's right to these proceeds raises a difficult legal question, and the authorities offer little guidance in a search for the answer.[4] Nonetheless, this Court ultimately concludes that secured parties do indeed have a right to claim transferees' proceeds. The language of the applicable statutes and the interplay of rights and obligations which arise under articles 2 and 9 of the UCC seem to dictate such a conclusion.

■ Before discussing the rationale behind this conclusion, it should be noted that any claim to any set of proceeds is limited by the requirement found in § 109A–9–306 that proceeds be "identifiable." This has historically been interpreted to mean that common law tracing principles be applied to make the necessary identification. *E. g., Michigan Nat'l Bank v. Flowers Mobile Homes Sales, Inc.,* 26 N.C.App. 690, 217 S.E.2d 108, 17 UCC Rep.Serv. 861 (N.C. 1975); *In re C. E. Pontz and Son, Inc.,* 2 UCC Rep.Serv. 1131 (E.D.Pa.1965), aff'd mem. 359 F.2d 436 (3d Cir. 1966). This requirement severely limits, as a practical matter, any secured party's claims to proceeds of any kind.

There are several relevant UCC sections and concepts which bear on the question of the rights of secured parties to claim proceeds collected by transferees. The most directly relevant of these provisions is the article 9 proceeds section itself. The 1962 version of that section, which governs this case, states that "notwithstanding sale [of the collateral, secured parties' liens continue] in any identifiable proceeds *including collections* received by the debtor," *Ga.Code Ann.* § 109A–9–306(2) (1962) (emphasis added), thereby implying that proceeds, by definition, are more than collections received by the debtor. It is of some assistance to compare that language with the Uniform Commissioners' 1953 version of the UCC, which limited secured parties' rights in proceeds to "proceeds *received by the debtor.*" *See Girard Trust Corn Exchange Bank v. Warren Lepley Ford, Inc.,* 1 UCC Rep.Serv. 531, 534 (Pa.Ct.C.P.1958).

The fact that the filing of a financing statement is supposed to give notice to the world that a debtor's property is encumbered is yet another indication that security interests should attach to transferees' proceeds. The effect of such notice to transferees is that they are charged with the knowledge that the property and its fruits are subject to the claims of lien-holding third parties.

■ Furthermore, to allow secured parties to claim proceeds collected by transferees is to harmonize the rights and obligations which arise under article 9 with those which arise under article 2. While article 9 imposes an obligation on transferees to surrender proceeds to those who hold liens on the property which gave rise to the proceeds, article 2 provides transferees with a right of action against the seller of the

---

**3.** To the extent that the 1962 code is ambiguous on this point, *compare* § 109A–9–203(1)(b) *with* § 109A–9–306(2), that ambiguity is cured for purposes of the instant case, because of the right to proceeds mentioned in the security agreement.

**4.** Even Professor Grant Gilmore, who supervised the drafting of article 9, does not address the issue in his seminal treatise, *Security Interests in Personal Property,* (1965) (see especially § 27). *See also* D. Epstein, *Proceeding Under the Uniform Commercial Code,* 30 Ohio St.L.J. 787 (1969).

There is no Georgia or federal authority on the question of claims made to transferees' proceeds. There is contradictory precedent among the authorities from other states, and the discussions which justify the decisions rendered by those authorities are of limited assistance. *See Get It Kwik, Inc. v. First Alabama Bank of Huntsville,* 361 So.2d 568, 24 UCC Rep.Serv. 944, 950 (Ala.Ct.Civ.App.1978); *Prod'n Credit Assoc. v. Melland,* 278 N.W.2d 780, 26 UCC Rep.Serv. 1355 (N.D.Sup.Ct.1979).

encumbered property for breach of statutorily-imposed warranties of title. UCC § 2–312, *Ga.Code Ann.* §§ 109A–2–312, 109A–2–714 (1962).[5]

Although this Court adopts the position that secured parties hold a right to recover transferees' proceeds, there are limitations on this right. One such limitation, which arises upon the bankruptcy of "a debtor," *Ga.Code Ann.* § 109A–9–306(4) (1962), eliminates secured parties' rights in cash proceeds which are on hand as of the date of a bankruptcy unless a secured party can show that the cash was collected within ten days before bankruptcy or that the cash was not mingled with cash from other sources.[6] The question in this case therefore becomes whether the § 9–306(4) limitation applies when pending bankruptcy proceedings involve not the debtor, but a transferee of the debtor.

The language of § 9–306(4) states that the bankruptcy of "*a* debtor" triggers the application of the subsection, while a security interest is created under § 9–203 with the consent of "*the* debtor." This contrast seems to indicate that the bankruptcy of the original debtor is not the only insolvency proceedings which will impose the § 9–306(4) restriction on claims made to cash proceeds. In addition, the Code's definition of "debtor" specifically states that the term should vary in meaning as the context requires.[7]

Furthermore, the apparent concern of those who drafted UCC § 9–306(4) is that the tracing of proceeds is always difficult and that this difficulty should result in restrictions on claims made to cash proceeds whenever a right to proceeds would prefer one creditor over another. Since this concern about the efficiency of tracing and potential preferences exists in virtually all insolvency proceedings, it is this Court's conclusion that the § 9–306(4) restriction arises upon the bankruptcy of any party whose property is subject to article 9 security interests.

The use of the phrase "a debtor," therefore, as it appears in *Ga.Code Ann.* § 109A–9–306(4) (1962), is hereby interpreted to include transferees who hold proceeds which are validly claimed by secured parties of "the debtor" who initially granted a lien on the property which gave rise to the proceeds.

*Rights of Ms. Hamilton*

Since Ms. Hamilton's lien is on the *corporation's* inventory and accounts, her claim is valid to the extent that there existed, at the time of the corporation's bankruptcy, inventory or accounts which are not validly subject to the claims of NBG as defined by the law outlined above. *Ga. Code Ann.* § 109A–9–312(5) (1962). Any dispute between Ms. Hamilton and NBG will ultimately turn upon the accuracy with which the parties are able to trace the transferee proceeds claims held by NBG.

*Rights of the Trustee*

The Trustee has a right to all other property of the estate, § 70, Bankruptcy Act.

---

5. This article 2 right of action might be termed a *quid pro quo* for the right of secured parties to collect transferees' proceeds.

While § 2–312 warranties may be negated by proof of the transferee's actual knowledge of the third party's lien, such a loss of warranty fits into the statutory scheme referred to above, because fully informed transferees not only assume the risks inherent in such a purchase but also find a replacement for their right of action against the seller in the form of a reduced price for the property as a result of the theoretical bargaining of the marketplace.

6. Grounded in provisions of state UCC law, this limitation, it should be understood, does not arise out of any part of federal bankruptcy law. In fact, the various attacks which a Trustee

might make, as a matter of bankruptcy law, on the rights of secured parties to transferees' proceeds would fail: § 60 elements are not met, because there has been no transfer of the debtor's property; § 67c is of no avail, because the lien on the proceeds do not "first become effective" upon bankruptcy; § 70c is ineffective, because of UCC §§ 9–312(5) and 9–301(1); and § 70e fails, in this case, for the same reasons as the failure of § 70c.

7. " . . . the term 'debtor' means the owner of the collateral in any provision . . . dealing with the collateral, the obligor in any provision dealing with the obligation, and may include both where the context so requires." *Ga.Code Ann.* § 109A–9–105(d) (1962).

This includes, for example, all equipment owned by the corporation, even if the equipment was acquired through the bulk transfer of assets from the partnership.

*Burden of Proof*

■ Since secured parties bear the burden of identifying, or tracing, the proceeds obtained upon the sale of property in which they have an interest, *Chrysler Credit Corp. v. Bank of Wiggins*, 358 So.2d 714, 24 UCC Rep.Serv. 453, 460 (Miss.Sup.Ct.1978); *Barth Brothers v. Billings*, 68 Wis.2d 80, 227 N.W.2d 673, 17 UCC Rep.Serv. 237, 246 (Wis.Sup.Ct.1975), further pre-trial will be scheduled in order for NBG to identify that property of the bankrupt to which it is entitled. This tracing is necessary only for those parties who wish to claim proceeds; a party such as Ms. Hamilton, who obtained an after-acquired property lien on corporate inventory and accounts by agreement with corporate agents, needs to show only that the encumbered property itself existed at the date of bankruptcy.

*Summary*

In accordance with the foregoing, this Court hereby grants NBG the cash held by the Trustee to the extent that the following types of property are traceable to the Trustee's cash:

(1) Partnership inventory which survived in that form until the Trustee's sale;

(2) Partnership accounts which were uncollected until the Trustee collected them;

(3) Proceeds (in whatever traceable form) collected by the partnership from the sale of its inventory and accounts since March 2, 1976; and

(4) Proceeds collected by the bankrupt corporation upon the sale of partnership inventory and accounts which were purchased by the bankrupt corporation from the partnership.

Ms. Hamilton has a right to the corporate inventory and accounts and their traceable proceeds to the extent such property is not subject to the claims of the bank under its rights listed above.

Neither NBG nor Ms. Hamilton may claim proceeds which existed in the form of cash at the date of bankruptcy, was collected more than ten (10) days before bankruptcy, and was mingled with non-proceeds cash.

The Trustee may claim all other property of the bankruptcy estate.

Accordingly, the Trustee is hereby ordered to prepare an accounting of what he sold at his post-bankruptcy sale. The accounting shall be filed with this Court within fifteen (15) days of the date of this Order, and the Trustee shall serve copies of said accounting to counsel for Ms. Hamilton and NBG. The accounting shall state what amount of cash in the Trustee's possession arose from the sale of the various types of the bankrupt's property, such as inventory, accounts receivable, equipment, cash, and any other reasonable classifications of property. A pre-trial conference will be held to address the evidentiary problems of the other parties in proving the rights they may have, in accordance with this Memorandum of Opinion, in the cash now held by the Trustees. Said pre-trial shall be conducted *in Room 310, United States Court of Appeals Courthouse, 56 Forsyth Street, N. W., Atlanta, Georgia, on the 3rd day of January, 1980, at 2:30 P.M.*